No. 16-1422

IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

UNITED STATES OF AMERICA

v.

MARIJAN CVJETICANIN,

Appellant

Appeal from the Final Judgment in a Criminal Case of the United
States District Court for the District of New Jersey (Crim. No.
14-274).   Sat Below: Honorable Michael A. Shipp, U.S.D.J.

_____

BRIEF FOR APPELLEE

_____

PAUL J. FISHMAN
United States Attorney
Attorney for Appellee
970 Broad Street
Newark, New Jersey 07102-2535
(973) 645-2700

On the Brief:

JOHN F. ROMANO
Assistant U.S. Attorney
(973) 645-2866

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

TABLE OF ABBREVIATIONS ........................................................................ ix

JURISDICTIONAL STATEMENT ..................................................................... 1

STATEMENT OF THE ISSUES ....................................................................... 1

STATEMENT OF RELATED CASES AND PROCEEDINGS ...................................... 2

STATEMENT OF THE FACTS AND THE CASE ................................................... 2

      A.    Factual Background.................................................................. 2

           1.    The Scheme.................................................................. 2

           2.    The Scheme Unravels ................................................... 5

           3.    The Aftermath ............................................................. 9

      B.    Procedural History.................................................................. 10

SUMMARY OF ARGUMENT ......................................................................... 12

ARGUMENT ............................................................................................. 14

POINT I       THE DISTRICT COURT DID NOT ERR BY DENYING CVJETICANIN'S
MOTION TO DISMISS THE SUPERSEDING INDICTMENT, WHERE EACH
OF THE NINE COUNTS PROPERLY CHARGED THAT CVJETICANIN USED
THE MAIL TO DEFRAUD HIS VICTIMS OF THOUSANDS OF DOLLARS........ 14

Point II      THE DISTRICT COURT DID NOT PLAINLY ERR BY NOT SUA SPONTE
FINDING PROSECUTORIAL MISCONDUCT DURING JURY DELIBERATIONS,
WHERE CVJETICANIN AGREED TO THE PROCEDURES USED IN ANSWERING
JURY NOTES AND THE DISTRICT COURT HAS ALREADY FOUND
THAT CVJETICANIN'S ASSERTIONS ARE "BASED ON [HIS]
MISCHARACTERIZATION OF THE FACTS." ................................................. 23

i

POINT III    THE DISTRICT COURT DID NOT CLEARLY ERR BY FINDING THAT
            CVJETICANIN CAUSED OVER $550,000 IN LOSS, WHERE THE COURT
            HEARD EVIDENCE AT TRIAL AND SENTENCING THAT CVJETICANIN'S
            LONG-RUNNING FRAUD CAUSED LOSSES WELL IN EXCESS OF THAT
            AMOUNT ................................................................................................. 33

POINT IV    THE DISTRICT COURT DID NOT CLEARLY OR PLAINLY ERR BY
            IMPOSING OVER $1.2 MILLION IN RESTITUTION, WHERE CVJETICANIN'S
            ECONOMIC CIRCUMSTANCES WERE IRRELEVANT UNDER THE
            APPLICABLE STATUTE AND THE FIRM'S LOSSES WERE DIRECTLY
            CAUSED BY HIS SCHEME TO DEFRAUD ..................................................... 44

CONCLUSION ............................................................................................................... 51

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

Carpenter v. United States,
484 U.S. 19 (1987) ........................................................................ 19

Hedgpeth v. Pulido,
555 U.S. 57 (2008) ........................................................................ 32

Krasnov v. Dinan,
465 F.2d 1298 (3d Cir. 1972) ...................................................... 44

Puckett v. United States,
556 U.S. 129 (2009) ...................................................................... 24

United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.,
822 F.3d 650 (2d Cir. 2016) ................................................... 19, 20

United States v. Al Hedaithy,
392 F.3d 580 (3d Cir. 2004) ........................................................ 15

United States v. Ali,
508 F.3d 136 (3d Cir. 2007) ........................................................ 34

United States v. Ali,
620 F.3d 1062 (9th Cir. 2010) ..................................................... 19

United States v. Amaya,
731 F.3d 761 (8th Cir. 2013) ....................................................... 24

United States v. Antoon,
933 F.2d 200 (3d Cir. 1991) ........................................................ 44

United States v. Barton,
366 F.3d 1160 (10th Cir. 2004) ............................................... 47, 49

United States v. Bergrin,
650 F.3d 257 (3d Cir. 2011) ..................................................... 15, 17

United States v. Berry,
  553 F.3d 273 (3d Cir. 2009) .................................................................... 41

United States v. Brennan,
  326 F.3d 176 (3d Cir. 2003) .................................................... 24, 25, 31

United States v. Brown,
  254 F.3d 454 (3d Cir. 2001) .......................................................... 25, 31

United States v. Bryant,
  655 F.3d 232 (3d Cir. 2011) .................................................... 16, 44, 48

United States v. Candrick,
  435 Fed. Appx. 404 (5th Cir. 2011) .................................................... 43

United States v. Coates,
  178 F.3d 681 (3d Cir. 1999) .................................................................. 47

United States v. Copple,
  24 F.3d 535 (3d Cir. 1994) ................................................................... 47

United States v. De La Fuente,
  353 F.3d 766 (9th Cir. 2003) ................................................................ 49

United States v. DeLaurentis,
  230 F.3d 659 (3d Cir. 2000) ................................................................. 18

United States v. DeRosier,
  501 F.3d 888 (8th Cir. 2007) ........................................................ 43, 49

United States v. Deutsch,
  987 F.2d 878 (2d Cir. 1993) ................................................................. 41

United States v. Dullum,
  560 F.3d 133 (3d Cir. 2009) .......................................................... 33, 35

United States v. D'Amato,
  39 F.3d 1249 (2d Cir. 1994) ........................................................ 19, 21

United States v. Fallon,
  470 F.3d 542 (3d Cir. 2005) ........................................................ 48, 49

iv

United States v. Frank,
   156 F.3d 332 (2d Cir. 1997) ........................................................... 21, 23

United States v. Fulford,
   267 F.3d 1241 (11th Cir. 2001) ............................................................ 28

United States v. Haut,
   107 F.3d 213 (3d Cir. 1997) .................................................................. 35

United States v. Hayward,
   359 F.3d 631 (3d Cir. 2004) .................................................................. 49

United States v. Hoffecker,
   530 F.3d 137 (3d Cir. 2008) .................................................... 19, 39, 47

United States v. Jacobs,
   167 F.3d 792 (3d Cir. 1999) .......................................................... 46, 47

United States v. Jimenez,
   513 F.3d 62 (3d Cir. 2008) .................................................................... 34

United States v. Kemp,
   500 F.3d 257 (3d Cir. 2007) .................................................................. 15

United States v. Koenig,
   952 F.2d 267 (9th Cir. 1991) ................................................................ 49

United States v. Kolodesh,
   787 F.3d 224 (3d Cir. 2015) ......................................................... passim

United States v. Lanas,
   324 F.3d 894 (7th Cir. 2003) ................................................................ 28

United States v. Lessner,
   498 F.3d 185 (3d Cir. 2007) .................................................... 35, 44, 47

United States v. Lloyd,
   807 F.3d 1128 (9th Cir. 2015) .............................................................. 31

United States v. Logar,
   975 F.2d 958 (3d Cir. 1992) .................................................................. 47

v

United States v. Marcus,
    560 U.S. 258 (2010) ........................................................................... 24

United States v. McGeehan,
    584 F.3d 560 (3d Cir. 2009) .............................................................. 19

United States v. Napier,
    273 F.3d 276 (3d Cir. 2001) .............................................................. 42

United States v. Ojomo,
    332 F.3d 485 (7th Cir. 2003) ............................................................. 40

United States v. Paccione,
    949 F.2d 1183 (2d Cir. 1991) ............................................................ 23

United States v. Pavulak,
    700 F.3d 651 (3d Cir. 2012) .............................................................. 24

United States v. Perez,
    280 F.3d 318 (3d Cir. 2002) .............................................................. 41

United States v. Pungitore,
    910 F.2d 1084 (3d Cir. 1990) ............................................................ 28

United States v. Quillen,
    335 F.3d 219 (3d Cir. 2003) .............................................................. 49

United States v. Rhodes,
    330 F.3d 949 (7th Cir. 2003) ............................................................. 50

United States v. Rivas,
    493 F.3d 131 (3d Cir. 2007) .............................................................. 25

United States v. Ruffin,
    780 F.2d 1493 (9th Cir. 1986) ........................................................... 48

United States v. Sanchez-Maldonado,
    737 F.3d 826 (1st Cir. 2013) ............................................................. 43

United States v. Scott,
    405 F.3d 615 (7th Cir. 2005) ............................................................. 49

United States v. Sepulveda,
115 F.3d 882 (11th Cir. 1997) .............................................................. 41

United States v. Sharma,
190 F.3d 220 (3d Cir. 1999) ................................................................ 42

United States v. Siddons,
660 F.3d 699 (3d Cir. 2011) ................................................................ 39

United States v. Siegelman,
786 F.3d 1322 (11th Cir. 2015) ........................................................... 40

United States v. Simmonds,
235 F.3d 826 (3d Cir. 2000) ................................................................ 48

United States v. Small,
793 F.3d 350 (3d Cir. 2015) ................................................................ 17

United States v. Smith,
528 F.3d 423 (5th Cir. 2008) ............................................................... 43

United States v. Starr,
816 F.2d 94 (2d Cir. 1987) .................................................................. 21

United States v. Stock,
728 F.3d 287 (3d Cir. 2013) ................................................................ 15

United States v. Syme,
276 F.3d 131 (3d Cir. 2002) ................................................................ 32

United States v. Tiller,
302 F.3d 98 (3d Cir. 2002) ...................................................... 20, 22, 23

United States v. Turcks,
41 F.3d 893 (3d Cir. 1994) .................................................................. 47

United States v. Tyson,
653 F.3d 192 (3d Cir. 2011) ................................................................ 24

United States v. Vitillo,
490 F.3d 314 (3d Cir. 2007) ......................................................... passim

United States v. W. Indies Transp., Inc.,
    127 F.3d 299 (3d Cir. 1997) ................................................................ 27

United States v. Wallach,
    935 F.2d 445 (2d Cir. 1991) ................................................................ 22

United States v. Ward,
    131 F.3d 335 (3d Cir. 1997) ................................................................ 25

United States v. Warr,
    530 F.3d 1152 (9th Cir. 2008) ............................................................. 43

United States v. Williams,
    10 F.3d 910 (1st Cir. 1993) ................................................................. 40

United States v. Zauber,
    857 F.2d 137 (3d Cir. 1988) ................................................................ 15

## Statutes

18 U.S.C. § 1341 ............................................................................... 10, 15

18 U.S.C. § 3231 .................................................................................... 1

18 U.S.C. § 3663A ........................................................................... 46, 48

18 U.S.C. § 3664 .............................................................................. 46, 48

18 U.S.C. § 3742(a) ............................................................................... 1

28 U.S.C. § 1291 .................................................................................... 1

## Rules and Sentencing Guidelines

Fed. R. Crim. P. 7(c)(1) ........................................................................ 14

U.S.S.G. § 1B1.3 ............................................................................. 39, 40

U.S.S.G. § 2B1.1 .......................................................................... passim

## <u>TABLE OF ABBREVIATIONS</u>

"A"                  refers to Defendant's Appendix.

"SA"                 refers to the Supplemental Appendix supplied by the United States.

"DB"                 refers to Defendant's Brief.

"PSR"                refers to the Pre-Sentence Report filed under seal with this Court.

"StR"                refers to the Statement of Reasons filed under seal with this Court.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. This Court has appellate jurisdiction over the challenges to the convictions and sentence under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), respectively.

## STATEMENT OF THE ISSUES

1.    Whether the District Court erred by denying Defendant's motion to dismiss the Superseding Indictment, where each of the nine counts properly charged that Defendant used the mail to defraud his victims of thousands of dollars.

2.    Whether the District Court plainly erred by not sua sponte finding prosecutorial misconduct during jury deliberations, where Defendant agreed to the procedures used in answering jury notes and the District Court has already found that Defendant's assertions are "based on [his] mischaracterization of the facts."

3.    Whether the District Court clearly erred by finding that Defendant caused over $550,000 in loss, where the Court heard evidence at trial and sentencing that Defendant's long-running fraud caused losses well in excess of that amount.

4.    Whether the District Court clearly or plainly erred by imposing over $1.2 million in restitution, where Defendant's economic circumstances were irrelevant under the statute and his employer's losses were directly caused by his scheme to defraud.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

The United States is not aware of any related cases or proceedings in this Court or any other court.

## STATEMENT OF THE FACTS AND THE CASE

### A.    Factual Background.

Defendant, Marijan Cvjeticanin, was trusted by many.   He was trusted by his employer. SA87-89.[1]   He was trusted by the clients he served as an attorney. A309-14, 331, 335-36, 343-46, 364, 370-71, 373, 383; SA19, 29.   And he was trusted by the Department of Labor. SA181-83.   All that trust was misplaced, and the results were disastrous: families forced to relocate, SA345-46; A878, 882; employees laid off, SA493; A879; PSR ¶ 58; decades-old business relationships destroyed, SA144-45, 490, 493; A879; PSR ¶ 58; and millions of dollars wasted, SA336, 345.   Cvjeticanin, however, profited handsomely, pocketing $668,977 in ill-gotten gains. SA427, 429, 510-12; see SA336 (rows A-E); A731-32.

### 1.    The Scheme

Cvjeticanin served first as a paralegal and later as an attorney at the New York immigration law firm of Wildes & Weinberg, P.C. ("the firm"). SA66-67, 77-79. In those positions, Cvjeticanin was the case manager for two long-time clients of the

---

[1]   Although it contains much of the trial transcript, Cvjeticanin's Appendix omits the first full day of trial, June 23, 2015.   The Government has provided that trial transcript in its Supplemental Appendix. See SA1-189.

2

firm—Automatic Data Processing ("ADP") and Broadridge Financial Solutions ("Broadridge"). SA79-80, 490; PSR ¶ 10.   Cvjeticanin's representation focused on securing permanent residence in this country for foreign employees of those companies, which required the filing of Permanent Labor Applications ("applications") with the Department of Labor. SA78-81, 84.   Those applications contained relevant information about the workers, including their education and experience, and a description of the position being filled. SA68-77.

In order to certify an application, the companies also had to show that they unsuccessfully recruited United States citizens for the position—a process which required, among other things, the placing of advertisements in two local Sunday newspapers. SA72-75.   Although the Department of Labor required applicants to represent the dates and locations of the advertisements, it did not regularly check to make sure those advertisements were placed. SA89-90, 181-83.   Rather, it occasionally audited applications, at which time it required applicants to submit proof (either an original or photocopy) that the advertisements had been placed as represented in the application. SA89-92.

Attorneys at the firm had long used the same vendor, Creative Effects, to place the necessary advertisements for the applications. SA76-77, 82.   Sometime prior to 2010, however, Cvjeticanin received permission from his boss at the firm, Steven Weinberg, to replace Creative Effects for the applications he worked on for

3

ADP and Broadridge. SA81-82; PSR ¶ 11.    Cvjeticanin chose a firm called

Flowerson Advertising ("Flowerson"). SA82.    Unbeknownst to Weinberg, the firm,

ADP, or Broadridge, Flowerson was owned and operated by Cvjeticanin—a fact that

he took pains to hide by, among other things, inventing an owner named "Marty

Flowerson" and disguising the identity of his wife, an employee, using her maiden

name. SA32, 37, 82-83, 93-95, 171; A141-50, 224-25, 235, 243, 300-01, 318-20,

323, 351-63, 395-99.

        In 2010, business picked up, A223, and Cvjeticanin became a lawyer at the

firm, SA79.    Knowing that neither Weinberg, the clients, or the Department of

Labor regularly checked to see if advertisements were properly placed, SA181, 394,

Cvjeticanin devised a scheme to defraud ADP and Broadridge.    Rather than spend

Flowerson's money placing advertisements, Cvjeticanin simply mailed bills to ADP

and Broadridge for advertisements that were never placed.    Between 2010 and

September 2012, Cvjeticanin, through Flowerson, sent 212 such invoices, falsely

representing that advertisements had been placed in Sunday papers and *Computer

World* magazine, ultimately collecting $668,977 from ADP and Broadridge for

"doing nothing." SA155, 158; <u>see</u> SA16-22, 27-32, 96-169, 173, 427, 429, 510-12;

A123, 243-47, 251-63; <u>e.g.</u>, SA256, 280, 285, 304, 315.

        Even though the advertisements were not placed, Cvjeticanin nonetheless

then completed applications, to be signed by the clients, representing that the

advertisements had been properly placed. A309-14.   Those false applications were

then submitted to the Department of Labor, SA144-45, 177; A121, where many

were approved in contravention of the advertising requirements, A121-22, 260;

SA108-09, 144-45, 163-64, 166-69, 171-72, 181-85.

Although many of the applications were initially approved, some were

audited by the Department of Labor. SA90, 96-97, 123-42.   Upon receiving notice

of an audit, Cvjeticanin would either place an advertisement in the newspaper

(months after it was supposed to be placed) or use an advertisement previously

placed for a different applicant, superimpose that advertisement on a newspaper

with the correct publication date, photocopy that doctored newspaper, and submit it

to the Department of Labor as proof that the advertisement had been properly

placed. SA101-02, 107-10, 123-42, 161-62, 181-82; A120-21, 245-64; see

SA237-42, 295-97.   Relying on those submissions, the Department of Labor

unwittingly approved the applications, even though the advertising had not been

properly completed. SA182.

### 2.    The Scheme Unravels.

In September 2012, after reading an email sent by Cvjeticanin from the firm's

computer server, the firm discovered that Cvjeticanin ran Flowerson. SA92-93.

Shocked by this information and concerned about the ethical implications, Weinberg

confronted Cvjeticanin, who admitted that he owned Flowerson and had deceived

the firm and its clients. SA92-95; see A305, 328, 363, 368-69, 390.   Cvjeticanin

was immediately fired. SA95.

With Cvjeticanin gone, Weinberg worked on completing the applications and

audit responses that Cvjeticanin had left in progress. SA95-97.   Weinberg quickly

discovered problems when an advertisement provided by Cvjeticanin did not match

the one that was represented to have been placed in an application. SA97-110; see

A260-64.   Concerned, Weinberg reviewed every application filed by Cvjeticanin

for the previous three years. SA108-10.

Weinberg found "very big problem[s]." SA116.   Although applications were

submitted to the Department of Labor and bills were mailed to the clients, Weinberg

found that advertisements were not placed as Cvjeticanin had represented and that

doctored advertisements had been submitted in response to audit requests.

SA110-42; see A245-63.   In making these determinations, Weinberg reviewed

"every single edition" of *Computer World* for this period and found none of the

advertisements purportedly placed by Cvjeticanin. SA112-13; A123.   And he

procured copies of all the relevant newspapers from the Library of Congress—again,

finding only a few advertisements placed by Cvjeticanin. SA100, 110-42; A130.[2]

---

[2]   Because Cvjeticanin placed advertisements after-the-fact in order to respond to
audits, the newspapers occasionally contained advertisements placed by him for
other applicants. E.g., A245-59.

6

Realizing that the applications submitted between 2010 and 2012 "contained

fraudulent information," Weinberg notified ADP and Broadridge of the problem.

SA144-45.   He also notified the U.S. Attorney's Office and other Government

agencies. SA146.

On March 27, 2013, at the direction of the Government, Weinberg video

recorded a meeting with Cvjeticanin. SA146-48; <u>see</u> SA356-421.[3]   At that meeting,

Cvjeticanin admitted that "we don't have any ads in *Computer Worlds*," SA358, but

claimed that the clients agreed to this arrangement as a way of compensating

Flowerson, SA150-58, 168, 170-71, 186; A123-25, 131-33, 218-19.   As for the

newspaper advertisements, Cvjeticanin blamed others for any mistakes, including

advertisers, the Library of Congress, and newspaper employees. SA162-63, 187-88;

A126-27.

Declaring himself "very proud" of what he had accomplished, A129,

Cvjeticanin also implicitly acknowledged that the applications were fraudulent,

explaining that all of them would be revoked if the truth were revealed to the

Department of Labor, SA166-72.   He therefore urged Weinberg to counsel the

---

[3] Although the video was admitted into evidence and large portions were played
for the jury, the transcript, which the Government includes at pages 356-421 of its
Supplemental Appendix, was not offered into evidence at trial.   It was, however,
made available to Cvjeticanin and later submitted with the Government's sentencing
brief. SA326.

clients to "sweep" the whole thing "under the rug," and he threatened to call his "contacts" and notify the authorities if ADP and Broadridge refused to look the other way. SA166-72, 179-80, 182-85, 398; <u>see</u> SA171 (Cvjeticanin: "They would have to revoke each and every I-140.   If they tried to, they're dead meat, they're dead meat.").   In a separate email, Cvjeticanin also threatened Weinberg and the firm, claiming that "since in the last 10-15 years I have collected numerous evidence regarding many matters of all three partners, any proceedings commenced against me will have wider implications for all of us, so I would really like to resolve this in an amicable way." A139-41; SA423.

In May 2013, Cvjeticanin was arrested in his Long Island home. A234.   At that time, he admitted that he owned and controlled Flowerson and conceded that he had placed no advertisements in *Computer World*, but claimed that he was permitted to nonetheless bill for that service pursuant to agreements with ADP and Broadridge. A243-44.   Cvjeticanin also consented to a search of his home. A236, 239.   In his basement, agents found folders containing documents related to the applications, doctored advertisements matching those submitted to the Department of Labor in response to audits, and evidence showing how Cvjeticanin doctored those advertisements. A239-43, 245-64.

### 3.    The Aftermath.

Unsurprisingly, ADP and Broadridge were unhappy that they had paid for advertisements that were never placed, and had unwittingly submitted fraudulent applications, which might adversely affect their workers and their families, some of whom were forced to relocate pending the refiling process. A303-06, 322-27, 335, 347, 364, 368, 385, 388-90, 878, 882; SA345-46.   The firm, therefore, agreed to make amends—providing, at no cost to ADP and Broadridge, proper advertising of the positions and refiling of the applications. SA158, 490-93; A194-95, 878-79. Despite those efforts, ADP and Broadridge cut ties with the firm, destroying a relationship that had started over two decades earlier and causing the firm to lay off several employees. SA144-45, 490, 493; A879; PSR ¶ 58.

In all, Cvjeticanin's three-year scheme caused over $1.2 million in direct losses, A731-32; see SA503-05, and much more when accounting for legal fees associated with untangling the mess he caused and steps taken to remediate the reputational damage he inflicted, SA345.   For his part, however, Cvjeticanin profited handsomely, pocketing $668,977 from ADP and Broadridge for doing nothing, SA427, 429, 510-12; see SA336 (rows A-E); A731-32, while simultaneously earning a generous salary from the firm for essentially ripping off its clients, see PSR ¶ 99.

**B.     Procedural History.**

Cvjeticanin was charged in a Superseding Indictment with nine counts of mail fraud, in violation of 18 U.S.C. § 1341. A750-60.   Cvjeticanin moved to dismiss the charges, claiming that this was merely a civil matter and there was "no intent to criminally defraud." A18.   The Honorable Michael A. Shipp, U.S.D.J., denied that motion, explaining that the Superseding Indictment sufficiently alleged mail fraud. A19, 765.

A five-day jury trial commenced on June 22, 2015.   During trial, the jury heard the testimony of: Weinberg; Special Agents Rick Patel and David Rowinski; and numerous employees of the firm, ADP, and Broadridge.   Several ADP and Broadridge employees testified that: they did not know that Cvjeticanin owned Flowerson; they did not agree to pay for advertisements that were not placed; and they would not have paid Flowerson had they known that the billed advertisements were not properly placed. A303-06, 318-28, 339-40, 347, 351-69, 385, 388-90. The jury also heard clips from a telephone conversation between Cvjeticanin and Weinberg, and saw extensive video clips from their in-person meeting. SA104-10, 146-88; A120-39; see SA356-421.

Cvjeticanin presented no evidence.   Nonetheless, while conceding that he placed no advertisements in *Computer World*, he contended that there was either an agreement or course of dealing that permitted him to charge ADP and Broadridge for

providing non-existent services. A96-97, 493-96.   He further blamed the clients for

not discovering the fraud, and asked, "What's wrong with people making money?"

A100, 103.

In summation, Cvjeticanin further claimed that the evidence showed that he

placed some of the advertisements in Sunday newspapers for some of the charged

counts, and he asked the jury to review those newspapers. A506-14.   The

Government responded by pointing to the testimony at trial that the placed

advertisements were "for a completely different job with completely different

requirements" (and were placed to make doctored advertisements for audited

applications), and therefore it, too, urged the jury to review the newspapers if it

wished. A516-18.

Following summations, the jury asked to see the newspaper exhibits for two

counts of the Superseding Indictment. A780.   With all parties in agreement, the

requested exhibits were in the process of being compiled, but that process was not

finished when the jury again asked to see those exhibits. A522-24, 781. See

generally SA212-45.   Again, with the agreement of all parties, the exhibits for one

of those counts were sent to the jury while compilation of the remaining material

continued. A524-25.   Before the balance could be submitted, the jury notified the

District Court that it had reached a verdict. A782.   Out of an abundance of caution,

and with no objection from Cvjeticanin, the Court sent the jury the materials it

requested on the remaining count. A525-28.   Shortly thereafter, the jury reiterated

that it had reached a verdict. A783.   That verdict, which was returned less than four

hours after deliberations began, A522, 529, was guilty on all counts, A529-30.

A sentencing hearing was held on February 18, 2016. A617-93.   Cvjeticanin

argued that he caused no loss or minimal loss, A621, 638-41, 856, was a "stand-out

citizen in the United States," A669, "has absolutely no remorse," A666, and should

receive a probationary sentence, A669, 840.   The Government strongly disagreed,

arguing that Cvjeticanin caused over $1.5 million in loss and should receive a

sentence in excess of 108 months' imprisonment. A625-30, 653-65; SA320-54.

After hearing extensive argument, the District Court found that the loss was between

$550,000 and $1.5 million, and calculated a Guidelines range of 57-71 months.

A650-52; StR.   Despite Cvjeticanin's lack of remorse and the damage he caused,

the Court imposed a bottom-of-the-Guidelines-range sentence of 57 months'

imprisonment. A3, 688-90.   The Court also ordered Cvjeticanin to forfeit $668,977,

SA510-12, and, following a hearing on March 23, 2016, A708-42, ordered him to

pay $1,254,163.36 in restitution to the victims of his offense, A7, 731-32, 953-55.

## SUMMARY OF ARGUMENT

Marijan Cvjeticanin is an unrepentant fraudster, who continues to falsely

maintain his innocence before this Court.   He defrauded his employer, its clients,

and the Department of Labor for years, pocketing hundreds of thousands of dollars

for work he never performed.   Provided with overwhelming evidence of his guilt, a jury swiftly found that Cvjeticanin had committed nine counts of mail fraud.

On appeal, Cvjeticanin raises two challenges to his convictions and two challenges to his sentence.   None has merit.

*First*, Cvjeticanin claims that the District Court should have dismissed the Superseding Indictment because his charged conduct amounted to no more than a breach of contract and not criminal fraud.   But Cvjeticanin's argument is built on factual inaccuracies and general propositions of law that have no application here. As the District Court (and later the jury) correctly found, Cvjeticanin's charged conduct undoubtedly satisfied the elements of mail fraud.

*Second*, Cvjeticanin alleges that the Government prevented the jury from reviewing exculpatory material during deliberations.   But the District Court properly rejected that argument as resting on a "mischaracterization of the facts." A10.   In any event, Cvjeticanin agreed with the procedures used by the District Court in responding to the jury's notes.

*Third*, Cvjeticanin challenges the District Court's loss calculation, maintaining that his three-year-long scheme caused no or minimal loss.   But the Court did not clearly err in finding over $550,000 in loss.   In fact, the evidence at trial alone (additional evidence was presented at sentencing) supported a loss calculation well in excess of that amount.

13

*Finally*, Cvjeticanin challenges the District Court's restitution order.   But

one of his arguments is premised on the wrong statute, and the other is without merit.

## ARGUMENT

### POINT I

**THE DISTRICT COURT DID NOT ERR BY DENYING CVJETICANIN'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT, WHERE EACH OF THE NINE COUNTS PROPERLY CHARGED THAT CVJETICANIN USED THE MAIL TO DEFRAUD HIS VICTIMS OF THOUSANDS OF DOLLARS.**

**Standard of Review: This Court exercises plenary review of a district court's denial of a motion to dismiss an indictment. United States v. Vitillo, 490 F.3d 314, 320 (3d Cir. 2007).**

Cvjeticanin argues that the District Court erred by denying his motion to

dismiss the Superseding Indictment.   According to Cvjeticanin, this matter was

merely "a breach of contract or civil matter" and therefore criminal charges were

unsupportable. DB12-15.   He is wrong, both legally and factually.   As the Court

correctly found, each of the nine counts in the Superseding Indictment properly

charged mail fraud.   The Court properly denied Cvjeticanin's motion to dismiss.

Under Fed. R. Crim. P. 7(c)(1), "[t]he indictment . . . must be a plain, concise,

and definite written statement of the essential facts constituting the offense

charged."   An indictment is sufficient "so long as it '(1) contains the elements of the

offense intended to be charged, (2) sufficiently apprises the defendant of what he

must be prepared to meet, and (3) allows the defendant to show with accuracy to

14

what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.' " United States v. Kemp, 500 F.3d 257, 280 (3d Cir. 2007) (quoting United States v. Vitillo, 490 F.3d 314, 321 (3d Cir. 2007)).   In order to properly state an offense, the indictment also "must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating." United States v. Al Hedaithy, 392 F.3d 580, 589 (3d Cir. 2004) (quoting United States v. Zauber, 857 F.2d 137, 144 (3d Cir. 1988)); see United States v. Stock, 728 F.3d 287, 292-93 (3d Cir. 2013); Vitillo, 490 F.3d at 321.

Because a motion to dismiss is a "challenge to the sufficiency of the indictment," it must "be decided based on the facts alleged within the four corners of the indictment, not the evidence outside of it." Vitillo, 490 F.3d at 321 (same is true even when raised after jury trial).   Moreover, the allegations in the indictment must be "accepted as entirely true," because the analysis is "geared only towards ensuring that legally deficient charges do not go to a jury." United States v. Bergrin, 650 F.3d 257, 265, 268 (3d Cir. 2011).   Because this is a legal determination, this Court exercises plenary review of a district court's denial of a motion to dismiss the indictment. Vitillo, 490 F.3d at 320.

Here, the Superseding Indictment charged Cvjeticanin with nine counts of mail fraud, in violation of 18 U.S.C. § 1341. A750-60.   In order to properly charge mail fraud, an indictment must allege: (1) "[t]hat [the defendant] knowingly devised

15

a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises;" (2) "[t]hat [the defendant] acted with the intent to defraud;" and (3) "[t]hat in advancing, furthering, or carrying out the scheme, [the defendant] used the mails, or caused the mails to be used." 3d Cir. Model Crim. Jury Instruction 6.18.1341; see also United States v. Bryant, 655 F.3d 232, 248 (3d Cir. 2011).   As the District Court correctly held, the Superseding Indictment "plainly satisfies" that standard. A19.

The Superseding Indictment alleged that Cvjeticanin "knowingly and intentionally" devised a scheme to defraud ADP and Broadridge of their "money and property" using "materially false and fraudulent pretenses, representations, and promises," namely "fraudulently billing and collecting monies from [ADP and Broadridge] for services which Flowerson never provided." A753.   It further alleged that Cvjeticanin carried out the scheme by: concealing his interest in Flowerson; causing Flowerson to mail over $500,000 in fraudulent bills to ADP and Broadridge for advertisements that were never placed; completing applications for submission to the Department of Labor that falsely represented that advertisements had been placed; covering up the fraud by doctoring advertisements in response to audits; and using the moneys paid to Flowerson for his own use. A754-57.

The Superseding Indictment specifically charged nine separate instances of mail fraud, each linked to the mailing of a false invoice billing either ADP or

Broadridge for thousands of dollars of non-existent services. A757.   If proven (and

they were), those allegations "constitute a violation of the law that [Cvjeticanin]

[was] charged with violating," United States v. Small, 793 F.3d 350, 352 (3d Cir.

2015), and "could result in a guilty verdict," Bergrin, 650 F.3d at 268.   The

Superseding Indictment, therefore, was plainly sufficient.

Nonetheless, Cvjeticanin claims that dismissal was appropriate because this

was merely a "civil dispute, not a criminal case." DB12.   According to Cvjeticanin:

a breach of contract cannot give rise to a criminal prosecution; ADP and Broadridge

got what they paid for; and ADP and Broadridge could have brought civil actions to

resolve any disputes. DB12-15.   His arguments are wrong for numerous reasons.

*First,* Cvjeticanin's claim that this whole matter was simply a "breach of a

civil contractual obligation" is wrong. DB13.   Contrary to his suggestion that the

"allegations pleaded in the Superseding Indictment establish on their face a breach

of contract," DB10, the Superseding Indictment never alleges any contract between

ADP, Broadridge, and Flowerson, see A750-57.   Instead, it alleges that the *firm*

"utilized the services" of Flowerson, which billed ADP and Broadridge for work that

was never done. A753-55.   Because this Court must credit the allegations in the

Superseding Indictment and not consider any "evidence outside of it," Vitillo, 490

F.3d at 321, Cvjeticanin's gloss on the facts is beside the point.

17

*Second*, even considering the evidence, Cvjeticanin's factual assertion is wrong.   At trial, it was established that ADP and Broadridge hired the *firm* to complete the applications for their employees. SA67-68, 84; A303, 309, 318, 350-51, 388.   Flowerson was the vendor used by Cvjeticanin (for the firm) to place the necessary advertisements. SA72-82; A177, 350-51; see A318 ("[O]ur outside law firm would contract an advertising firm.").   Multiple witnesses further testified that there were no agreements whatsoever between ADP, Broadridge, and Flowerson. SA156, 168, 186; A125, 131-33, 219, 303-05, 318, 327-28, 339-40, 368, 375-77, 388-89.   Cvjeticanin's claim, therefore, that this entire matter was merely a breach of Flowerson's contracts with ADP and Broadridge is factually wrong.

*Third*, by pointing to evidence outside the four corners of the Superseding Indictment, Cvjeticanin is essentially raising an entirely different basis for relief.   If Cvjeticanin believed that the evidence showed there was a contract, and that the presence of a contract undermined the basis for his convictions, then he could have challenged the sufficiency of the *evidence* in a post-trial Rule 29 motion. See United States v. DeLaurentis, 230 F.3d 659, 661 (3d Cir. 2000) ("The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29."). Cvjeticanin, however, did not raise that claim in his Rule 29 motion, A768-79, 785-86, and, by not appealing the sufficiency of the evidence, DB1-3, has waived

18

that claim on appeal, United States v. Hoffecker, 530 F.3d 137, 162-63 (3d Cir. 2008).[4]

*Fourth*, even assuming that there was a contractual relationship between Flowerson, ADP, and Broadridge, Cvjeticanin's invocation of potential civil remedies is misplaced. DB14-15.   After all, "[t]he simple fact that [ADP and Broadridge] *may* have brought a civil contract claim against [him] does not immunize [his] conduct from criminal prosecution if that conduct meets the elements of the criminal statutes as well." United States v. Ali, 620 F.3d 1062, 1071 (9th Cir. 2010); cf. Carpenter v. United States, 484 U.S. 19, 27 (1987) (rejecting claim that conduct did not violate mail fraud statute because it "was no more than a violation of workplace rules").   That is because "a contractual relationship between the parties does not wholly remove a party's conduct from the scope of fraud." United States ex rel. O'Donnell v. Countrywide Home Loans, Inc., 822 F.3d 650, 658 (2d Cir. 2016).   Therefore, that ADP and Broadridge could have brought civil suits is beside the point.

*Fifth*, although Cvjeticanin correctly notes that the mere nonperformance or breach of a contract does not "by itself . . . constitute fraud," Countrywide, 822 F.3d at 658; see United States v. McGeehan, 584 F.3d 560, 571 (3d Cir. 2009); United

---

[4] By failing to adequately raise or brief them on appeal, Cvjeticanin has waived several other arguments as well. See DB15 n.1, 29 n.2, 33 n.4.

States v. D'Amato, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994), that general proposition

cannot help him here.   As the Second Circuit explained in Countrywide, the breach

of a contract *does* constitute fraud where the defendant "made affirmative fraudulent

misrepresentations to their contractual counterparties in the course of performance

or to feign performance under the contract." Countrywide, 822 F.3d at 658; see id. at

661 n.12.

Assuming the presence of a contract (which, again, did not exist), that is

exactly what happened here.   Over a three-year period, Cvjeticanin, through

Flowerson, sent 212 invoices—including the 9 explicitly charged in the Superseding

Indictment—representing that work had been done and demanding payment.

Unbeknownst to ADP and Broadridge, both of which paid the invoices, that work

was not done.   Far from mere non-performance or a garden-variety "contractual

breach," Cvjeticanin defrauded ADP and Broadridge over and over again,

repeatedly making fraudulent misrepresentations with the intent to defraud. Id. at

658, 661 n.12.[5]   As the District Court correctly held—and the properly-instructed

jury found—that constitutes mail fraud. See United States v. Tiller, 302 F.3d 98, 100

(3d Cir. 2002) (defendant caused invoices to be mailed to contract partner for

---

[5] In support of his motion to dismiss, Cvjeticanin argued that "there was no intent
to criminally defraud." A18.   But the Superseding Indictment alleged such intent,
which ends the matter.   In any event, in convicting him of all nine counts, the jury
found beyond a reasonable doubt that Cvjeticanin acted with such intent.

services that were not performed); <u>United States v. Frank</u>, 156 F.3d 332, 335-36 (2d Cir. 1997) (affirming mail fraud conviction where defendant defrauded contract partner by charging for services that were not performed).[6]

*Sixth*, Cvjeticanin's assertion that his conduct cannot constitute mail fraud because ADP and Broadridge "got the ultimate benefit of their contract with Flowerson, i.e., the retention of their foreign employees," DB15, is wrong on several levels.   Fundamentally, ADP and Broadridge paid the *firm* to complete the applications, not Flowerson.   ADP and Broadridge paid Flowerson for placing the necessary advertisements—which were never placed.   In other words, ADP and Broadridge got "nothing" in exchange for the hundreds of thousands of dollars they paid *Flowerson*. SA155, 158.   That the applications were approved does not change the fact that ADP and Broadridge paid for advertisements that were never placed.

---

[6] Cvjeticanin cites <u>D'Amato</u>, 39 F.3d at 1257, for the proposition that "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution," DB13.   But the very next line of that opinion makes the Second Circuit's point clear—"Instead, the deceit must be coupled with a contemplated harm to the victim." <u>D'Amato</u>, 39 F.3d at 1257.   Cvjeticanin cannot possibly argue that there was no contemplated harm to ADP or Broadridge, both of which paid hundreds of thousands of dollars for services that were never performed. For that reason, this case is easily distinguishable from another case cited in Cvjeticanin's brief, <u>United States v. Starr</u>, 816 F.2d 94 (2d Cir. 1987). DB13.   In that case, "the government adduced no evidence of an intent to harm the . . . customers," because they received the services they paid for while a completely different entity was defrauded. <u>See Starr</u>, 816 F.2d at 98-101.   The Second Circuit had no trouble distinguishing that case in <u>Frank</u>, which bears many similarities with this case. <u>See Frank</u>, 156 F.3d at 336.

In any event, Cvjeticanin can hardly use the approval of the applications he submitted as proof that "Flowerson substantially complied with its contractual obligations it had with ADP and Broadridge." DB14.   After all, "providing alternative services does not defeat a fraud charge because the fact remains that the corporation and its shareholders did not receive the services that they believed were being provided." United States v. Wallach, 935 F.2d 445, 461 (2d Cir. 1991); Tiller, 302 F.3d at 106 ("Tiller's argument ignores the critical fact that PHA bargained and paid for in-person, on-site monitoring of claimants, but was fraudulently deprived of this service.").

Here, ADP and Broadridge thought they were paying for the submission of applications that complied with the law—not fraudulent applications that exposed them and their workers to adverse consequences. SA108-09, 116-17, 144-45, 345-46; A303-06, 322-27, 335, 347, 364, 368, 385, 388-90, 878, 882.   Indeed, even Cvjeticanin acknowledged that the applications were fraudulent and that all of them would be revoked if the Department of Labor discovered the fraud, SA166-72—an outcome that effectively came to pass when the firm was forced to refile numerous applications at its own expense, SA158, 490-93; A194-95, 878-79.   Simply put, neither ADP nor Broadridge "g[o]t what they paid for," because the filed applications were fraudulent and exposed them and their employees to adverse

consequences. <u>United States v. Paccione</u>, 949 F.2d 1183, 1197 (2d Cir. 1991); <u>see</u>

<u>Tiller</u>, 302 F.3d at 106-07; <u>Frank</u>, 156 F.3d at 335-36.

*Finally*, Cvjeticanin claims that "making a criminal case out of what, at most,

is a civil suit implicates grave jurisdictional issues," especially "in light of the

substantially higher burden of proof in a criminal case." DB15.   But Cvjeticanin

cannot explain how his concerns affect the motion-to-dismiss analysis.   Nor can he

explain how the higher burden of proof counsels in favor of dismissing the

Superseding Indictment.   Indeed, after being properly instructed as to that burden of

proof and the elements of the offense, the jury found that Cvjeticanin committed

nine acts of mail fraud.   His argument, therefore, is meritless.

### POINT II

**THE DISTRICT COURT DID NOT PLAINLY ERR BY NOT SUA SPONTE FINDING PROSECUTORIAL MISCONDUCT DURING JURY DELIBERATIONS, WHERE CVJETICANIN AGREED TO THE PROCEDURES USED IN ANSWERING JURY NOTES AND THE DISTRICT COURT HAS ALREADY FOUND THAT CVJETICANIN'S ASSERTIONS ARE "BASED ON [HIS] MISCHARACTERIZATION OF THE FACTS."**

**<u>Standard of Review</u>: If not waived, then this Court reviews arguments raised for the first time in a new trial motion for plain error. <u>United States v. Kolodesh</u>, 787 F.3d 224, 230 n.4, 231 (3d Cir. 2015).**

Cvjeticanin claims that the District Court abused its discretion by failing to

find that the Government misconducted itself during jury deliberations, thereby

violating his "due process right to a fair trial." DB16-27.   Unfortunately for him, the

District Court has already debunked this claim, finding that it is "based on [his]

23

mischaracterization of the facts." A10; see A13.   Even worse for him, he *agreed* to

the procedures used in answering the jury's notes, meaning that he has waived this

claim.   In any event, Cvjeticanin cannot carry his burden of showing plain

error—or, for that matter, any error at all.

Denials of new trial motions are generally reviewed for abuse of discretion.

See United States v. Pavulak, 700 F.3d 651, 671 (3d Cir. 2012).   Where, however, a

defendant did not contemporaneously object to a trial error, and instead raises the

claim for the first time in a new trial motion, this Court reviews only for plain error.[7]

See United States v. Kolodesh, 787 F.3d 224, 230 n.4 (3d Cir. 2015); United States

v. Brennan, 326 F.3d 176, 186, 188 (3d Cir. 2003).[8]   And where a defendant invites

---

[7] To show plain error, a defendant must establish "that (1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " United States v. Marcus, 560 U.S. 258, 262 (2010) (quoting Puckett v. United States, 556 U.S. 129, 135 (2009)).   Even if those requirements are satisfied, this Court may deny a remedy. See United States v. Tyson, 653 F.3d 192, 211 (3d Cir. 2011).

[8] Cvjeticanin cites only the abuse of discretion standard of review. DB2, 16.   But he cannot sidestep his failure to contemporaneously object—and the resulting plain error standard of review—simply by appealing from the denial of his new trial motion. E.g., United States v. Amaya, 731 F.3d 761, 764-67 (8th Cir. 2013) (reviewing grant of new trial motion and finding that district court did not abuse its discretion by finding that defendant had borne its burden of showing plain error).

the error, as Cvjeticanin did here, he cannot challenge it at all on appeal. See

Kolodesh, 787 F.3d at 231; United States v. Ward, 131 F.3d 335, 342 (3d Cir. 1997).

Where a defendant claims prosecutorial misconduct, this Court "must first be

convinced that the prosecution did in fact misconduct itself." United States v. Rivas,

493 F.3d 131, 139 (3d Cir. 2007).   Even if there has been misconduct, on plain error

review, the burden is on the defendant to further show an "egregious error or a

manifest miscarriage of justice." Brennan, 326 F.3d at 182 (quoting United States v.

Brown, 254 F.3d 454, 458 (3d Cir. 2001)).

Briefly, after beginning deliberations, the jury asked to see the newspaper

exhibits for Counts 1 and 5 of the Superseding Indictment, A780, none of which had

been initially provided to the jury because of their voluminous nature, A13, 522-23.

Because the parties had left for lunch, that jury note was not discussed in open court

until almost one hour after it was written. A522, 780.   With all parties in

"agreement," the requested exhibits were in the process of being compiled, but that

process was not finished when the jury again asked to see those exhibits. A522-24,

781. See generally SA212-45.   Again, with the agreement of all parties, the exhibits

for Count 1 and all the *Computer World* magazines were sent to the jury while the

exhibits for Count 5 were compiled. A11, 524-25.   Shortly thereafter, before the

balance could be submitted, the jury notified the District Court that it had reached a

verdict. A525, 782.   At that time, the Government informed the Court that it was

still searching for one newspaper related to Count 5, which the Government

surmised might have been inadvertently removed from the courtroom. A526.   The

Court then directed the Government to find the exhibit.   Out of an abundance of

caution, and, with no objection from Cvjeticanin, once it received that exhibit the

Court sent the jury all the materials for Count 5. A11, 525-28.   Shortly thereafter,

the jury reiterated that it had reached a verdict. A783.   That verdict was guilty on all

counts. A529-30.

On appeal, Cvjeticanin claims that he was "unfairly convicted" because the

Government improperly removed allegedly exculpatory evidence from the

courtroom, thereby thwarting the jury's ability to review evidence it requested

pertaining to Counts 1 and 5 of the Superseding Indictment. DB16-22.   According

to Cvjeticanin, this misconduct undermined his ability to present a defense and

infected the jury's verdict as to all nine counts of the Superseding Indictment.

DB23-27.   Cvjeticanin further claims that the jury likely held the failure to produce

the exhibits against him, because during his summation he implored the jury to

review those exhibits, which he claimed would exonerate him. DB26-27.

Cvjeticanin made nearly identical claims in his new trial motion, compare DB16-27,

with A770-77, which the Government comprehensively debunked in its response,

SA212-45.   More importantly, the District Court rejected his contentions,

explaining that they were "based on [his] mischaracterization of the facts." A10.

26

Undeterred, Cvjeticanin raises them yet again.   But nothing has changed since the Court rejected them—they are still meritless for numerous reasons.

*Initially*, Cvjeticanin waived this claim, and therefore this Court should refuse to consider its merits. See United States v. W. Indies Transp., Inc., 127 F.3d 299, 306 (3d Cir. 1997).   After the District Court read the first jury communication, the parties agreed to compile "all the papers" for the jury. A522-23.   Cvjeticanin agreed with this proposal, noting that "it may prevent us from having to come down frequently and everyone coming back on if they have more things they want to see." A523.   He further represented that "the government and defense have gone over all of the exhibits that are going back to the jury, and we're all in agreement with everything that's going back there and it comports with what was introduced into evidence." A523.   After the Court summarized the proposal, defense counsel remarked, "Thank you, your Honor." A524.

After the second jury communication was read, the Government proposed to send to the jury all the materials for Count 1 and the *Computer World* magazines, while the materials for Count 5 were being compiled. A524-25.   Cvjeticanin had "no objection" to this proposal. A525.   And, again, after the Court summarized the procedure that would be used, counsel thanked the Court. A525.

Finally, after the jury's third communication, which announced that it had reached a verdict, Cvjeticanin represented that he had nothing to add. A525-26.

27

The District Court then explained that it would hold off on accepting the jury's verdict and would first send the materials for Count 5 to the jury. A526-28. Cvjeticanin did not object.

Because Cvjeticanin repeatedly "represent[ed] that [he] w[as] satisfied" with the District Court's handling of the jury's notes, he has waived this claim. United States v. Lanas, 324 F.3d 894, 903 (7th Cir. 2003); see United States v. Fulford, 267 F.3d 1241, 1246-47 (11th Cir. 2001) ("[H]aving agreed to the court's proposed instruction, Gage appears to have waived his right to challenge that instruction on appeal."); United States v. Pungitore, 910 F.2d 1084, 1128 (3d Cir. 1990).   Simply put, Cvjeticanin "invited any error and cannot complain now." Kolodesh, 787 F.3d at 231.

In any event, even if this claim is not waived, Cvjeticanin cannot show error, much less reversible plain error.   For starters, Cvjeticanin's claim is littered with factual inaccuracies.   In fact, the District Court found that Cvjeticanin's "argument . . . mischaracterizes the timeline of events prior to the jury rendering a verdict and this Court accepting that verdict." A13.

*First*, contrary to his repeated assertions, DB19-25, the jury received the exhibits for Count 1 *before* it first announced that it had reached a verdict, A11, 524-25.   And the Court provided the jury with the exhibits for Count 5 *before* it accepted that verdict. A11, 526-28.   The jury, therefore, had all of the requested

28

materials *before* it reiterated to the Court, in its fourth communication, that it had reached a verdict.[9]

*Second*, contrary to his assertion, this evidence was not "excluded" and he was not thereby "deprived" of his "basic right to test the Government's theory." DB23.   These exhibits were entered into evidence at the start of trial, SA12, and Cvjeticanin could have used them to his advantage at any time.   Having asked to see them, the jury clearly understood that those exhibits were available for its consideration. <u>See</u> A780.   By waiting until summations to disclose his theory, Cvjeticanin ran the risk that the jury would never ask to review these exhibits, or, if it did, would nevertheless reach a verdict before it had reviewed any or all of them. As this Court recently explained, that the jury asks for material but returns a verdict before it receives that material is simply no basis to upset its verdict. <u>Kolodesh</u>, 787 F.3d at 238-39.

---

[9] Cvjeticanin suggests that the passage of time between the jury's first communication and the parties' response was attributable to disorganization and delay by the Government. DB25.   But that is not the case.   Because the parties had left for lunch, the jury's initial communication was not discussed in court until almost one hour after it was written. A522, 780.   And the parties then agreed to compile all the newspaper exhibits for every count and send them to the jury at one time—a proposal that Cvjeticanin explicitly agreed to as a way of forestalling future requests by the jury. A522-23.   Moreover, Cvjeticanin expressed no contemporaneous concerns about any delay in responding to the jury's communications. A523-26.

*Third*, contrary to his suggestion, DB18-20, 23, these exhibits were not exculpatory.   As the Government explained in its response to Cvjeticanin's new trial motion, the "tactical reason[]," DB18, that he did not mention these exhibits until summation was that he "could not have credibly attempted to argue at trial that the advertisements were exculpatory or that they were placed in connection with the relevant [Department of Labor] filings for Counts 1 and 5 (or any other count). [Cvjeticanin's] argument would have been easily unmasked through a simple comparison of the actual newspaper advertisements and the incriminating files found in [his] basement." SA242.[10]   In other words, the advertisements highlighted during Cvjeticanin's summation were placed in connection with different applications, and were placed so that Cvjeticanin could doctor newspapers in response to Department of Labor audit requests. SA237-42; <u>see</u> A516-18.   Indeed, the jury itself may have discovered this after reviewing the materials for Count 1, which it received *before* it announced that it had reached a verdict.

---

[10]   At trial, Weinberg and Agent Patel testified that they reviewed the newspapers for the charged counts and did not find any matching advertisements. SA110-42; A245-63.   That testimony was unrebutted. <u>See</u> A151-217, 265-66.   Moreover, during his videotaped conversation with Weinberg, Cvjeticanin threatened ADP and Broadridge by acknowledging that the Department of Labor would "have to revoke each and every [application] that was billed on this since 2010," SA166, 371—an admission that he had not placed the advertisements as represented.

30

Even putting aside these factual inaccuracies, Cvjeticanin still cannot show any error, much less a plain one that affected his substantial rights and seriously undermined the fairness of the proceedings.    Indeed, Cvjeticanin cannot even explain what the error was.    He does not claim that the District Court erred by failing to suspend deliberations pending delivery of the requested exhibits.    Nor could he—a district court does not abuse its discretion, much less plainly err, by refusing to take that step. Kolodesh, 787 F.3d at 239.    Nor can he explain how the Government misconducted itself, especially because the one newspaper that was briefly mislaid "contains no advertisement whatsoever placed by" Cvjeticanin. SA238; A526.    As the Court correctly held, "the misplacing or unintentional brief removal of an exhibit from the courtroom does not constitute prosecutorial misconduct." A11-12 n.2; see United States v. Lloyd, 807 F.3d 1128, 1168 (9th Cir. 2015) ("A prosecutor's inadvertent mistakes or misstatements are not misconduct.").

And even if there was an error, Cvjeticanin cannot show "egregious error or a manifest miscarriage of justice." Brennan, 326 F.3d at 182 (quoting Brown, 254 F.3d at 458).    After all, any delay only affected Counts 1 and 5.    And setting aside the newspaper advertisements altogether, the jury had a wholly independent basis for convicting him on each of the nine counts in the Superseding Indictment—the *Computer World* advertisements.    The evidence showed, and defense counsel

31

admitted at trial, that Cvjeticanin did not place any advertisements in *Computer World* despite repeatedly billing ADP and Broadridge for that service. A96, 123, 243-47, 251-63, 493; SA16-22, 27-32, 112-13, 150-58, 173, 358, 427, 429; e.g., SA256, 280, 285, 304, 315.   And Cvjeticanin's claim that he was allowed to bill that way pursuant to agreements with those companies was soundly rejected by a succession of witnesses who testified without contradiction that no such agreements existed. A124-25, 131, 218-19, 303, 327-28, 339-40, 368, 388-89; SA186. Because the evidence on that theory was overwhelming, any errors in getting the jury the materials they asked for on the alternative theory could not possibly have prejudiced Cvjeticanin. Cf. Hedgpeth v. Pulido, 555 U.S. 57, 58-62 (2008) (court can affirm conviction where there are two theories of guilt, only one of which is valid); United States v. Syme, 276 F.3d 131, 148 (3d Cir. 2002) ("[W]e should presume that the jury relied on an alternative theory of guilt within the same count that is both legally valid and supported by sufficient evidence.").

Finally, Cvjeticanin's contention that the jury essentially punished him for the delay in providing the exhibits is misplaced speculation. DB26.[11]   Although Cvjeticanin's summation urged the jury to review the newspaper exhibits, he fails to

---

[11] Cvjeticanin now suggests that the District Court should have provided an "instruction regarding the issues with the Government's evidence." DB26.   But Cvjeticanin made no such proposal below, and he does not now explain what that instruction would have said.

acknowledge that the Government echoed that sentiment in its rebuttal—"hold us to our burden on that.   Go look at them, you'll see, [the advertisements are] not there at all, completely different jobs or completely different dates that do not match up." A516-17.   Given that the Government bore the burden of proof, and had likewise urged the jury to review the exhibits, it is far more likely that the Government would have borne the brunt of the jury's frustration at the delay in receiving the exhibits.

## POINT III

**THE DISTRICT COURT DID NOT CLEARLY ERR BY FINDING THAT CVJETICANIN CAUSED OVER $550,000 IN LOSS, WHERE THE COURT HEARD EVIDENCE AT TRIAL AND SENTENCING THAT CVJETICANIN'S LONG-RUNNING FRAUD CAUSED LOSSES WELL IN EXCESS OF THAT AMOUNT.**

**<u>Standard of Review</u>: The District Court's finding as to the amount of loss is reviewed for clear error. <u>United States v. Dullum</u>, 560 F.3d 133, 137 (3d Cir. 2009).**

Cvjeticanin argues that the District Court clearly erred in finding that he caused over $550,000 in loss, asserting instead that the Court should have limited its loss finding to the $28,775 which he claims is attributable to the nine counts of conviction. DB27-33.[12]   He is wrong.   Through evidence admitted at both trial and sentencing, the Government easily satisfied its burden of showing by a preponderance of the evidence that Cvjeticanin's long-running fraud caused well

---

[12] Cvjeticanin's brief says $28,783, DB7, but that is an obvious mathematical error, <u>see</u> SA336; A757, 862.

over $550,000 in loss.   The Court's conservative estimate of loss, therefore, was not clearly erroneous.

Pursuant to U.S.S.G. § 2B1.1, the offense level should be increased based on amount of loss.   "Loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense," i.e., the "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i), (iv).   A loss of between $550,000 and $1,500,000 results in an offense level increase of 14 levels, while a loss of between $15,000 and $40,000 results in an offense level increase of 4 levels. U.S.S.G. § 2B1.1(b)(1).

The Government has the burden of showing the amount of loss by a preponderance of the evidence. United States v. Jimenez, 513 F.3d 62, 86 (3d Cir. 2008).   "[O]nce the Government makes out a prima facie case of the loss amount, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate." Id.   The district court "need only make a reasonable estimate of the loss. . . . based on available information." U.S.S.G. § 2B1.1 cmt. n.3(C); see United States v. Ali, 508 F.3d 136, 145 (3d Cir. 2007).

Because the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence," the "court's loss determination is

entitled to appropriate deference." U.S.S.G. § 2B1.1 cmt. n.3(C).   The district

court's loss calculation, therefore, is reviewed for clear error, United States v.

Dullum, 560 F.3d 133, 137 (3d Cir. 2009), and this Court will reverse those factual

findings only if they are "completely devoid of a credible evidentiary basis," United

States v. Vitillo, 490 F.3d 314, 330 (3d Cir. 2007) (quoting United States v. Haut,

107 F.3d 213, 218 (3d Cir. 1997)), and the Court is "left with a definite and firm

conviction that a mistake has been committed," United States v. Lessner, 498 F.3d

185, 199 (3d Cir. 2007).

Here, the parties sharply disagreed as to the loss caused by Cvjeticanin's

scheme.   Cvjeticanin maintained that there was no loss, or, at most, $28,775, which

was the loss attributable to the fraudulent invoices charged in the nine counts of

conviction. A621, 638-41, 856.   He thus argued that he deserved either a 0- or

4-level loss enhancement. A621.

The Government, on the other hand, argued that the loss totaled $1,967,338,

warranting a 16-level enhancement. A625-30; SA335-38.   The Government laid

out several distinct categories of loss, as detailed in the below "actual loss chart,"

which was provided in the Government's sentencing memorandum.   Those loss

categories were: the amount contained in the invoices for the 9 counts of conviction

(Row A); the *Computer World* advertising costs for the other 203 invoices (Rows B

and C); the Sunday newspaper advertising costs for the other 203 invoices (Rows D

35

and E); the advertising costs incurred by the firm to refile 93 applications (Row F);

the refiling fees incurred by the firm (Row G); and the employee expenses incurred

by the firm in employing seven individuals to refile 93 applications over a three-year

period (Row H).[13]

### Actual Loss Chart

| | Description of Loss | Source | Amount |
|---|---|---|---|
| A. | Counts 1-9 of the Indictment (Fraudulent Invoices Sent by Flowerson to ADP and Broadridge) | *Jury Verdict *Government Trial Exhibits *Trial testimony | $28,775 |
| B. | Computer World Advertising Fees Paid to Flowerson by ADP (less the Computer World Advertising Fees contained in Counts 1-9 of the Indictment) | *Government Trial Exhibits 14-165; 227 *Trial testimony | $148,435 ($153,595 - $5,160) |
| C. | Computer World Advertising Fees Paid to Flowerson by Broadridge (less the Computer World Advertising Fees contained in Counts 1-9 of the Indictment) | *Government Trial Exhibits 166-226 *Trial testimony | $48,478 ($52,518 – $4,040) |

---

[13] As he did below, Cvjeticanin claims that the firm refiled fewer applications, and suggests that this proves that not all of the applications filed by him were fraudulent. DB31-32; A639-40. But consistent with the only evidence provided—Weinberg's affidavit and his trial testimony—the Court found that 93 applications were refiled. SA491; A194-95, 603-04, 651, 878. And the Government explained the various reasons why not every application needed to be refiled, none of which involved the filing of non-fraudulent applications by Cvjeticanin. A603-04, 656.

| D. | Advertising Fees Paid to Flowerson by ADP (less the Advertising Fees contained in Counts 1-9 of the Indictment) | *Government Trial Exhibits 14-165; 227 *Trial testimony | $318,690 ($482,659 - $153,595 - $10,374) |
|---|---|---|---|
| E. | Advertising Fees Paid to Flowerson by Broadridge (less the Advertising Fees contained in Counts 1-9 of Indictment) | *Government Trial Exhibits 166-226 *Trial testimony | $124,599 ($186,000 - $52,318 - $9,200) |
| F. | Wildes & Weinberg Creative Effects Re-Advertising Fees for U.S.C.I.S. Immigration Petitions | *Weinberg Affidavit | $119,825.90 |
| G. | Wildes & Weinberg U.S.C.I.S Immigration Petition Re- Filing Fees | *Weinberg Affidavit | $63,100 |
| H. | Wildes & Weinberg Remediation Employee Expenses | *Weinberg Affidavit | $1,115,435.10 |
| | | Total Loss Amount: | $1,967,338 |

SA336.[14]

At sentencing, the District Court referred to the above loss chart, finding that the Government had proven Rows A, F, and G. A650-51. It then moved to Row H, finding that approximately $465,000 in employee expenses—calculated as $5000 for each of the 93 refiled applications—was a reasonable estimate of the cost incurred by the firm. A651. Using those numbers, the Court arrived at a loss

[14] The Probation Department, using slightly different numbers, calculated a loss amount of $2,030,672.26, which also corresponded with a 16-level enhancement. PSR ¶¶ 43-49.

amount of $676,000. A651.[15]   The Court further explained that there was no reason

to decide if Rows B-E had been proven, because "even if the Court were to include

these numbers in their entirety in its calculation, these numbers would not affect the

offense level." A651.   The Court, therefore, imposed a 14-level loss enhancement.

A651.

Although the District Court declined to address Rows B-E at sentencing, it

discussed those loss amounts in its Judgment and Order of Forfeiture. SA510-12.

The Court found, consistent with Rows A-E, that "the Government has proven by a

preponderance of the evidence that [Cvjeticanin] is liable for a personal money

judgment in the amount of **$ 668,977.00**, representing the amount of proceeds

obtained as a result of the mail fraud offenses." SA510-11.   It further explained:

> The Court notes that because the advertising fees paid by ADP and
> Broadridge, which total $640,202,[16] would not alter
> [Cvjeticanin's] offense level, the Court did not include these fees in
> its determination of the applicable offense level during sentencing.
> Based on the Court's review of the evidence and testimony
> presented at trial, however, the Court finds that the Government has
> shown by a preponderance of evidence that these fees are not
> materially false and are thus properly included in the Court's
> calculation of a forfeiture money judgment.

SA511.

---

[15] As the Government pointed out in its submission on restitution, that calculation
actually amounts to $676,700.90. SA504.

[16] That amount corresponds to Rows B-E.

Despite the District Court's findings, which would have supported loss in excess of $1.3 million, Cvjeticanin argues that the Court clearly erred by "calculating the loss figure . . . to be $676,000 and rejecting [his] proposed loss calculation of [$28,775]." DB27.   According to Cvjeticanin "the jury's verdict as to the nine counts should be determinative as to the amount of loss," DB29, and all costs associated with the firm should have been disregarded as "extremely speculative" and "exaggerated," DB31-32.[17]   Not so.   Indeed, "if anything, the [$676,000] total was a conservative estimate." Hoffecker, 530 F.3d at 197.

Contrary to Cvjeticanin's argument, the loss associated with the nine counts of conviction is not "determinative as to the amount of loss." DB29.   Rather, "the determination of loss and other factors pertinent to a fraudulent scheme is never confined to the date of the charged mailing or wiring, but always encompasses all relevant conduct that was 'part of the same course of conduct or common scheme or plan.' " United States v. Siddons, 660 F.3d 699, 704 (3d Cir. 2011) (quoting U.S.S.G. § 1B1.3(a)(2)).   Here, the 203 fraudulent invoices accounting for the

---

[17] Cvjeticanin mentions other arguments, but does not develop them.   Briefly, his claim that "he did not intend to defraud anyone" and only "wanted praise as a good lawyer," DB29, was rejected by the jury and unsupported by the evidence. And his attempt to argue, yet again, that he caused no loss to ADP and Broadridge because they got their employees is plainly false. DB29.   Those companies paid Flowerson to place advertisements, which were never placed, and they paid the firm for legally compliant applications, which were not provided.

$640,202 in loss set forth in Rows B-E were unquestionably part of the same scheme as the 9 invoices charged as substantive counts in the Superseding Indictment. Indeed, the Superseding Indictment alleged that Cvjeticanin sent over $500,000 in fraudulent bills to ADP and Broadridge, of which over $206,000 were for unplaced *Computer World* advertisements. A754.   Those fraudulent invoices, therefore, clearly qualified as relevant conduct because they were part of a "common scheme or plan." See U.S.S.G. § 1B1.3 cmt. n.5(B)(i) (setting forth considerations); e.g., United States v. Siegelman, 786 F.3d 1322, 1332-34 (11th Cir. 2015) (common scheme where defendant's conduct involved the same accomplices and same victims); United States v. Ojomo, 332 F.3d 485, 489-90 (7th Cir. 2003) (similar); United States v. Williams, 10 F.3d 910, 913-14 (1st Cir. 1993) (similar).

And as the District Court correctly explained in its forfeiture order, the Government established the losses associated with Rows B-E by at least a preponderance of the evidence.   Evidence at trial, including his own admissions, showed that Cvjeticanin placed no advertisements in *Computer World* despite billing ADP and Broadridge for that service over and over again, causing those firms to spend nearly $200,000 for advertisements that he concedes were never placed (Rows B and C). A96, 123, 243-47, 251-63, 493; SA16-22, 27-32, 112-13, 150-58, 173, 358, 427, 429; e.g., SA256, 280, 285, 304, 315.   And multiple witnesses

40

eviscerated his claim that this practice was permitted. A124-25, 131, 218-19, 303, 327-28, 339-40, 368, 388-89; SA186.

Overwhelming evidence also supported the Government's theory that Cvjeticanin placed no appropriate advertisements in the Sunday newspapers either, despite billing ADP and Broadridge nearly $450,000 for that non-existent service (Rows D and E). SA97-142, 427, 429; A130, 245-64.   The evidence at trial further showed over $600,000 flowing from ADP and Broadridge, through Flowerson, to Cvjeticanin's pockets. A395-99; SA431.   Simply put, the evidence that Cvjeticanin defrauded ADP and Broadridge of $668,977 was overwhelming and proven beyond a reasonable doubt at trial.   The Government thus clearly satisfied its burden of showing by a preponderance of the evidence that Cvjeticanin caused at least $550,000 in loss, and therefore the Court did not clearly err by imposing the 14-level loss enhancement.[18]

Because this Court can affirm for any reason on the record, United States v. Perez, 280 F.3d 318, 337 (3d Cir. 2002), and the loss amounts in Rows A-E more

---

[18]  Cvjeticanin cannot possibly argue that these loss amounts are "derived from mere speculation." DB28.   Indeed, the cases he cites all involve situations of patent mistake.   For example, in United States v. Deutsch, 987 F.2d 878, 886 (2d Cir. 1993), the loss amount was essentially impossible given the nature of the scheme. In United States v. Sepulveda, 115 F.3d 882, 891 (11th Cir. 1997), the court included losses based on evidence that was "inconclusive."   And in United States v. Berry, 553 F.3d 273 (3d Cir. 2009), the court drew sweeping inferences from, among other things, a plainly incorrect reading of the defendant's arrest record.

than justify Cvjeticanin's 14-level enhancement, this Court need not consider his challenges to the inclusion of Rows F-H in the loss calculation, e.g., United States v. Napier, 273 F.3d 276, 281 (3d Cir. 2001); United States v. Sharma, 190 F.3d 220, 229 (3d Cir. 1999) (even if there was an error, it would be harmless because it would not change the offense level).

In any event, those losses were well-supported.   Weinberg testified at trial that the firm agreed to refile the applications at its expense, that it did so, and that the advertising cost was approximately $106,000. SA158, 169; A194-95.   He further provided an affidavit and supporting materials in advance of sentencing setting forth the advertising, refiling, and employee costs of this endeavor, as well as proof that the firm's insurance carrier had covered some of these expenses. SA335, 490-93; A878-904; see PSR ¶¶ 43-49, 58.   Despite this evidence, the District Court slashed the line item for the firm's salary expenses (Row H), eliminating any reliance on employees' health care costs and estimating a total loss of $5000 per refiled application, for a total of $465,000. A651.[19]

Even after those reductions, Cvjeticanin claims that Weinberg's calculations were "exaggerated." DB32.   Based on his argument, it appears that Cvjeticanin believes that Weinberg's numbers are so exaggerated that none of them should count

---

[19] So much for Cvjeticanin's complaint that the loss finding included the firm's "health care costs." DB32.

at all. DB33 ("no way to reduce the amount of claimed salaries").   But that makes

no sense.   Moreover, Cvjeticanin is particularly ill-suited to complain about the

lengths the firm took to remedy his fraud.   After all, Cvjeticanin acknowledged that

his fraud would lead to the revocation of "each and every" application he filed,

SA166-72, 370-72, 383-84, and therefore he knew that those applications would

need to be refiled.[20]   And he elicited testimony at trial establishing that the

application process was complex, time-consuming, and labor-intensive. A152-60.

As several individuals explained, it took years to clean up the mess that Cvjeticanin

left in his wake. A335; SA491-92; PSR ¶¶ 58-59.

Simply put, Cvjeticanin cannot explain how this evidence, "straight from the

mouth of the victim," is insufficient, United States v. Sanchez-Maldonado, 737 F.3d

826, 828 (1st Cir. 2013); see United States v. Smith, 528 F.3d 423, 425 (5th Cir.

---

[20] In a footnote, Cvjeticanin notes that he argued below that these costs were not
foreseeable to him. DB33 n.4.   He does not raise that claim on appeal, and with
good reason.   Courts regularly find that the costs incurred in remedying the
damages caused by the defendant's conduct constitute "reasonably foreseeable
pecuniary harm." U.S.S.G. § 2B1.1 cmt. n.3(A)(i), (iv); e.g., United States v.
Candrick, 435 Fed. Appx. 404, 406 (5th Cir. 2011) (unpublished) (loss included fees
expended by employer in notifying clients about the security breach caused by the
defendant); United States v. Warr, 530 F.3d 1152, 1159-60 (9th Cir. 2008) (millions
in dollars of fire suppression costs were foreseeable to a defendant who started
numerous forest fires); United States v. DeRosier, 501 F.3d 888, 894-95 (8th Cir.
2007) ("[I]t was reasonable and foreseeable that [the employer's] internal audit team
would investigate one of their employees who was involved in acquiring loans from
bank customers.").

2008); cf. Kolodesh, 787 F.3d at 239-40 (loss amount derived from testimony of

co-conspirators), and does not constitute "a reasonable estimate of the loss,"

U.S.S.G. § 2B1.1 cmt. n.3(C).   And because there were multiple ways to reach a

loss figure of over $550,000, Cvjeticanin cannot show that the District Court's loss

finding was " 'completely devoid of minimum evidentiary support displaying some

hue of credibility, or . . . bears no rational relationship to the supportive evidentiary

data.' " United States v. Antoon, 933 F.2d 200, 204 (3d Cir. 1991) (quoting Krasnov

v. Dinan, 465 F.2d 1298, 1302 (3d Cir. 1972)).


## POINT IV

**THE DISTRICT COURT DID NOT CLEARLY OR PLAINLY ERR BY IMPOSING OVER $1.2 MILLION IN RESTITUTION, WHERE CVJETICANIN'S ECONOMIC CIRCUMSTANCES WERE IRRELEVANT UNDER THE APPLICABLE STATUTE AND THE FIRM'S LOSSES WERE DIRECTLY CAUSED BY HIS SCHEME TO DEFRAUD.**

**Standard of Review: This Court exercises plenary review over legal claims and abuse of discretion review as to the amount of restitution ordered. United States v. Bryant, 655 F.3d 232, 253 (3d Cir. 2011). Factual findings are reviewed for clear error. United States v. Vitillo, 490 F.3d 314, 330 (3d Cir. 2007).   Unraised claims are reviewed for plain error. United States v. Lessner, 498 F.3d 185, 201 (3d Cir. 2007).**

Finally, Cvjeticanin raises two challenges to the District Court's order that he

pay $1,254,163.36 in restitution.   According to Cvjeticanin, the Court erred by

(1) not considering his financial status and (2) finding that the firm was a victim of

his offense. DB33-41.   His arguments are meritless.   Cvjeticanin's first argument,

besides not having been raised below, is premised on an inapplicable statute, and therefore he cannot show error, much less reversible plain error.   His second argument fares no better, because the firm easily meets the statutory definition of "victim" for purposes of restitution.

Following sentencing, the parties briefed the issue of restitution.   Relying on the District Court's loss calculation at sentencing and its forfeiture order, the Government sought restitution in the amount of $1,316,902.90. SA501-05.[21] Cvjeticanin objected to this calculation, claiming that the figures were inflated. A823-28, 932-34.   After hearing extensive argument, A708-31, and "careful[ly] review[ing]" the parties' submissions, the Court found "that the total amount of actual losses caused by, and directly resulting from [Cvjeticanin's] criminal conduct as alleged in the Superseding Indictment, and sustained by the victims of said conduct, is $1,254,163.36," A731-32, 953-55; see A7.[22]

Now, on appeal, Cvjeticanin faults the District Court for "fail[ing] to comply with precedential law requiring certain findings be made," which he claims are

---

[21] Using the actual loss chart, see **Point III**, the Government calculated that amount by adding Rows A-G with the $465,000 loss the Court found for Row H. SA503-04.

[22] The Court arrived at that figure by slightly reducing the amounts contained in Rows F and G. A732.   Even if applied to the loss amount, however, those reductions do not affect Cvjeticanin's offense level, because the loss would still exceed $550,000. See U.S.S.G. § 2B1.1(b)(1)(H).

codified in "18 U.S.C. § 3664(a)." DB36.   Citing a series of cases, Cvjeticanin

asserts that the Court should have made findings regarding his "financial resources"

and the "financial needs and earning ability of [him] and [his] dependents."

DB36-37.   Having failed to raise this claim below, however, Cvjeticanin bears the

burden of showing plain error.   But he cannot show any error, much less plain error.

Unfortunately for Cvjeticanin, the version of the statute he cites was

"replaced" two decades ago. United States v. Jacobs, 167 F.3d 792, 796 (3d Cir.

1999).   In 1996, Congress enacted the Mandatory Victims Restitution Act

("MVRA"), which makes restitution mandatory for "any offense committed by

fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii).   Under the MVRA, which

Cvjeticanin concedes applies here, DB38-39, "the court shall order restitution to

each victim in the *full amount* of each victim's losses as determined by the court and

*without consideration of the economic circumstances of the defendant*," Jacobs, 167

F.3d at 796 (quoting 18 U.S.C. § 3664(f)(1)(A)); see 18 U.S.C. § 3663A(d) ("An

order of restitution under this section shall be issued and enforced in accordance

with section 3664.").

As this Court explained in Jacobs, "subsection (f)(1)(A) replaced deleted

subsection (a)"—erroneously quoted by Cvjeticanin—"which had required the

sentencing court to consider the financial resources and needs of the defendant."

Jacobs, 167 F.3d at 796.[23]   Because the economic circumstances of Cvjeticanin and

his dependents are "irrelevant under the MVRA," United States v. Barton, 366 F.3d

1160, 1166 (10th Cir. 2004), he cannot show that the District Court erred, much less

plainly so, by sua sponte failing to make such findings.[24]

 Cvjeticanin's final argument fares no better.   He claims that the firm "should

not have been considered a 'victim' of the offenses," because it "voluntarily acted on

[its] own accord" to refile the applications for ADP and Broadridge and therefore the

losses it incurred were not caused by his crime. DB38-41.   He further asserts that

---

[23] The cases cited by Cvjeticanin predate the MVRA and apply its predecessor,
the Victim and Witness Protection Act. See DB37-38; e.g., United States v. Turcks,
41 F.3d 893, 902 (3d Cir. 1994); United States v. Copple, 24 F.3d 535, 549 (3d Cir.
1994); United States v. Logar, 975 F.2d 958, 961 (3d Cir. 1992). See generally
United States v. Coates, 178 F.3d 681, 683 & n.3 (3d Cir. 1999).

[24] After imposing full restitution, district courts must consider the defendant's
financial resources in setting a payment schedule. See Coates, 178 F.3d at 683-84.
Cvjeticanin's brief does not argue that the District Court erred in failing to consider
his resources in setting a payment schedule, and therefore any such claim is waived.
See Hoffecker, 530 F.3d at 162-63.   In any event, such consideration need not be
explicit, and by setting a post-confinement schedule of $1000 per month, A7, the
Court did not plainly err, see Lessner, 498 F.3d at 201-02, especially considering
that Cvjeticanin refused to provide any financial information to the Probation
Department, PSR ¶ 103, and has bragged about his wealth in his submissions to the
Court, see Crim. No. 14-274, docket entry 134, at 5 (noting that his "3,500 sq. f[oot]
Brookfield colonial house," complete with "gazebo, inground swimming pool,"
"law library," and other amenities is worth "in excess of $700,000," and that he also
owns "a brand new one bedroom investment condominium located at prime Queens
real estate area" worth "over $400,000").

the losses were independently "claimed" by ADP. DB40.   His arguments are

meritless.

Under the MVRA, a "victim" is "a person directly and proximately harmed as

a result of the commission of an offense . . . including, in the case of an offense that

involves as an element a scheme, conspiracy, or pattern of criminal activity, any

person directly harmed by the defendant's criminal conduct in the course of the

scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2); see United States v.

Fallon, 470 F.3d 542, 548 n.12 (3d Cir. 2005).[25]   The overarching purpose of the

MVRA is, "to the extent possible, to make victims whole, to fully compensate

victims for their losses, and to restore victims to their original state of well-being."

United States v. Simmonds, 235 F.3d 826, 831 (3d Cir. 2000).

Here, after agreeing with ADP and Broadridge, the firm paid to have the

applications refiled properly, as it had been paid to do by those companies.

SA144-45, 158, 490-93; A194-95, 878-79.   Obviously, "[b]ut for [Cvjeticanin's]

conduct, the [firm] would not have incurred" the additional costs of refiling

---

[25] Courts have held that "person" includes "nonhuman entities," such as
businesses and the Government. United States v. Ruffin, 780 F.2d 1493, 1496 (9th
Cir. 1986); see Bryant, 655 F.3d at 253.   In addition, the MVRA permits restitution
to be paid to entities, such as insurance companies, which reimburse victims for their
losses. See 18 U.S.C. § 3664(j)(1).   Here, restitution was ordered to be paid to
Liberty International Underwriters, which had reimbursed the firm for some of its
losses. A7.

applications that were supposed to have been properly filed in the first place, <u>United States v. Quillen</u>, 335 F.3d 219, 225 (3d Cir. 2003) (cost of decontaminating mail room), thereby rendering the costs "directly related to [Cvjeticanin's] offense conduct," <u>United States v. De La Fuente</u>, 353 F.3d 766, 773 (9th Cir. 2003).   And far from being "too far removed" from Cvjeticanin's conduct, <u>Fallon</u>, 470 F.3d at 549, the firm's costs were entirely foreseeable to him.   Cvjeticanin acknowledged that his fraud would lead to the revocation of "each and every" application he filed, SA166-72, 370-72, 383-84, so he knew that those applications would need to be refiled.   Unsurprisingly then, courts regularly find that entities forced to clean up the mess created by a defendant's conduct are properly considered "victims" under the MVRA. <u>E.g.</u>, <u>United States v. DeRosier</u>, 501 F.3d 888, 896-97 (8th Cir. 2007) (employer bank incurred attorney's fees, employee costs, and waiver of customers' bank fees, all of which "stem[med] from" the defendant's fraudulent conduct); <u>United States v. Scott</u>, 405 F.3d 615, 618-19 (7th Cir. 2005) (employers' audit expenses); <u>Barton</u>, 366 F.3d at 1167 (cost to revegetate forest destroyed by arson); <u>United States v. Hayward</u>, 359 F.3d 631, 642 (3d Cir. 2004) (parents were victims where they incurred expenses obtaining the return of their victimized children from abroad); <u>De La Fuente</u>, 353 F.3d at 773 (cleanup cost associated with purported anthrax attack); <u>Quillen</u>, 335 F.3d at 225 (labor and material costs for decontaminating mail room); <u>United States v. Koenig</u>, 952 F.2d 267, 275 (9th Cir.

49

1991) (under similar provision of VWPA, costs incurred by bank in notifying

customers, answering inquiries, and reprogramming accounts).

Moreover, contrary to Cvjeticanin's argument, that the firm "voluntarily"

agreed to refile the applications does not mean that it is not a victim of his fraudulent

scheme. DB40.   Indeed, the firm "should be lauded, not punished, for stepping up

to the plate and making its customers whole." United States v. Rhodes, 330 F.3d

949, 954 (7th Cir. 2003).   After all, had the firm not refiled the applications and

borne that cost, then ADP and Broadridge would have been forced to refile those

applications at its own expense—which likewise would have been compensable

under the MVRA.[26]

Finally, Cvjeticanin's assertion that the firm's losses were duplicative of

ADP's claims, DB40, is simply wrong.   Cvjeticanin was ordered to pay restitution

to ADP and Broadridge for the hundreds of thousands of dollars they spent for

advertisements that were never placed.   The firm's losses, on the other hand, were

---

[26] Cvjeticanin suggests that the firm "could have spent $10 million" in refiling the applications, and that he "should not be responsible" to pay such exorbitant costs. DB40.   But no such thing happened here.   Indeed, Weinberg testified that the firm's advertising costs were *far lower* than what Cvjeticanin had been billing ADP and Broadridge. SA157-58.   And the District Court slashed the firm's requested expenses, budgeting just $5000 in employee expenses for filing each of the 93 applications. A651.   Cvjeticanin's concern, therefore, is misplaced.

incurred in refiling those applications properly. <u>See</u> <u>generally</u> SA501-05.

Cvjeticanin's argument, therefore, is meritless.

### C<span style="font-variant:small-caps">ONCLUSION</span>

For all of these reasons, this Court should affirm the judgment.

Respectfully submitted,
PAUL J. FISHMAN
United States Attorney

By:  s/ JOHN F. ROMANO
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ   07102-2535
(973) 645-2866

Date:   August 18, 2016

## CERTIFICATE OF COMPLIANCE

I hereby certify that I am an Assistant United States Attorney for the District of New Jersey, that I am filing the attached Brief for Appellee, and:

(1)  this brief contains 12,126 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and thus does not exceed the 14,000-word limit;

(2)  this brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because it has been prepared using a Microsoft WORD 2010 word-processing system and it is in a proportionally-spaced typeface, namely Times New Roman, that is at least 14 points;

(3)  the text of the electronic PDF brief and appendix is identical to the text of the paper copies of the brief and appendix; and

(4)  The electronic PDF brief and appendix have been prepared on a computer that is automatically protected by a virus detection program, namely a continuously-updated version of Trend Micro OfficeScan, and no virus was detected.

_____
By: s/ John F. Romano
Assistant U.S. Attorney

Dated:   August 18, 2016

## CERTIFICATION OF FILING AND SERVICE

I hereby certify that on August 18, 2016, I caused the Brief and Supplemental Appendix for Appellee to be filed with the Clerk of this Court by (a) electronic filing in the PDF form using the Circuit's electronic filing system, and (b) paper filing of an original and six paper copies of the Brief and four copies of the Supplemental Appendix using postage-prepaid first-class mail.

I also certify that on August 18, 2016, I caused the Brief and Supplemental Appendix for Appellee to be served:

[X] by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system, on the following Filing User:

Lorraine S. Gauli-Rufo, Esq.
lgaulirufo@gmail.com

[X] by service of one paper copy by postage-prepaid first-class mail, on:

Lorraine S. Gauli-Rufo, Esq.
130 Pompton Avenue
Verona, NJ 07044

_____
s/ John F. Romano
Assistant U.S. Attorney

Dated: August 18, 2016